UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE ARREST OF RALPH CARDARELLI, 4 JOSEPH STREET, DERRY, NEW HAMPSHIRE | Case No. 1:23-mj-____ |

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

**RALPH CARDARELLI (DOB: ████████ )**

I, William Hughes, being duly sworn, declare and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent (SA) of the United States Food and Drug Administration, Office of Criminal Investigations (FDA-OCI), and have served as an FDA-OCI Special Agent for the past ten years. I am assigned to the Boston Resident Office; whose geographic jurisdiction includes the District of New Hampshire. I am responsible for investigating violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 et seq., and other federal statutes enforced by FDA, and am authorized to conduct investigations, make arrests, and execute search and arrest warrants for these offenses. I was previously a Special Agent with the Criminal Investigation Command, United States Army, for over eleven years. I have received training in criminal investigative techniques throughout my law enforcement career and have completed courses including the FDA-OCI Special Agent Training Program at the Federal Law Enforcement Training Center and the United States Army Criminal Investigations Special Agent Training Course. I graduated from Campbell University in North Carolina with a degree in Criminal Justice.

2. The following information is based on my personal observations, my training and experience, and information obtained from law enforcement personnel and witnesses. The purpose

of this affidavit is limited to showing that probable cause exists to support the issuance of an arrest warrant and criminal complaint. Accordingly, while this affidavit contains all the material information that, I am aware of that is pertinent to the requested arrest warrant and complaint, it does not include each and every fact known by me or other investigators concerning the investigation.

## PURPOSE OF AFFIDAVIT

3.     This Affidavit is made in support of criminal complaint and arrest warrant for RALPH CARDARELLI, DOB: ███████, 4 Joseph Street, Derry, New Hampshire.

4.     Based on my training and experience, I submit that the facts contained in this Affidavit establish probable cause to believe that CARDARELLI has committed violations of 21 U.S.C. § 841(a)(1) (distribution or possession with intent to distribute controlled substances) and 21 U.S.C. §§ 331(k) (causing a drug to become misbranded after shipment in interstate commerce).

## THE INVESTIGATION

5.     This investigation began after a confidential informant (CI) notified the Derry Police Department, Derry, New Hampshire of CARDARELLI's involvement in the importing, manufacturing, and distributing of unapproved and counterfeit drugs, including drugs commonly known as steroids. Following a detailed interview of the CI by the Derry Police and me, I contacted Customs and Border Protection (CBP) for CARDARELLI's import package history. The check revealed that CARDARELLI had received nearly fifty international shipments, mostly from China, since March 2022, declared usually as paper boxes, stickers, and bottles. On March 1, 2023, a CBP Officer notified me of a package addressed to CARDARELLI entering the country from China through the Boston, MA seaport. The package was detained and upon inspection revealed to contain drug labels and drug vial boxes. Printed on the labels was the name "SummitGrow Labs" and

"www.summitgrow-pharma.com." The labels and boxes had the following drug names: Anavarbol, Tren A200 and Npp 100 (Nandrolone Phenylpropionate). These names are associated with steroids often used illicitly for body building. Specifically, Anavarbol is also known as Oxandrolone, a Schedule III controlled substance, and Trenbolone and Nandrolone are also both Schedule III controlled substances.  Following the inspection and documentation of the package, it was allowed to pass through customs. According to FedEx tracking, the package was delivered to the CARDARELLI residence on March 2, 2023.

### CONTROLLED DELIVERY SEARCH WARRANT(S)

6.      On March 14, 2023, Homeland Security Investigations (HSI) reported to me that CBP had seized a package with a "DHL EXPRESS WORLDWIDE" label affixed to it. The package entered the United States from Hong Kong and was manifested as "STEEL MOLD USE EVERETT SAMPLE." The label showed DHL Tracking #3629777874 with recipient "RALPH CARDARELLI, 4 JOSEPH STREET DERRY NH 03038." Upon examining the package, it was revealed to contain a pill press die with the markings "AD" and "30," markings associated with Adderall, a prescription drug and Schedule II controlled substance.

7.      On March 23, 2023, special agents from OCI-FDA, HSI and local law enforcement executed a federal search warrant, #23-mj-54-01-DL, on CARDARELLI's residence at 4 Joseph Street in Derry. After items were discovered that were not within the scope of the original search warrant, HSI SA Jarred Matyka prepared an affidavit in support of a second federal warrant, #23-mj-55-01-DL, which was executed on the same day. Attached hereto as **ATTACHMENT A and B** are true and accurate copies of SA Matyka's supporting affidavits. SA Matyka's supporting affidavits are further incorporated herein by reference for all intents and purposes.

8.      During the execution of the federal search warrants, the following items were observed: (1) a "mixer" typically used to combine raw materials for pill manufacturing, which is depicted in the first image below; (2) scales used to weigh raw materials, which are depicted in the second image below; (3) shelves containing various finished drug products and separated by drug type, which are depicted in the third image below; (4) bins containing various finished drugs, all separated by drug type, which are depicted in the fourth image below; and (5) a "pill press" used to manufacture pills, which is depicted in the fifth image below.











9.     A detailed review of the evidence collected following the execution of the search warrant revealed over 4800 vials/bottles of suspected prescription drugs, including vials/bottles labeled as Nandrolone Phenylpropionate, Trenbolone Acetate, Testosterone Enanthate, Clomiphene, Anadrol, Dianabol, Tamoxifen, Tadalafil, Viagra and others. A sampling of each drug seized during the execution of the search warrant was sent to the FDA's Forensic Chemistry Center (FCC) for testing. In addition to the drugs and drug manufacturing machinery depicted above, several different colored bags of microcrystalline cellulose were collected as evidence. Microcrystalline cellulose is an excipient commonly used in the pharmaceutical industry in the manufacturing of pills.

10.     I requested an expedited / rolling return of the results of analysis. On June 26, 2023, Samuel Gratz, Ph.D. Supervisory Chemist, FCC, provided the results of nine of the forty-three items sent to the FCC. The following drugs were identified based on retention time and mass spectral comparison with corresponding reference standards: Nandrolone Phenylpropionate, Trenbolone Acetate, Dromostanolone Propionate, Boldenone Undecylenate, Testosterone Propionate, Trenbolone Enanthate, Nandrolone Decanoate, Testosterone Enanthate and Testosterone Cypionate. Each of these drugs is a Schedule III controlled substance and prescription drug.

11.     Also collected as evidence from the search warrant were two phones belonging to CARDARELLI. A forensic analysis of the phones was completed, and a review of the contents revealed CARDARELLI communicating with an "Eric Wang" via "WhatsApp Chats" concerning the ordering and purchasing of drugs, vials, labels, and boxes. Wang appears to be a Chinese national working for a Chinese company selling products on Alibaba, a global internet marketplace. In one thread Wang informed CARDARELLI that "steroids is forbidden on Alibaba. So we need

[to] talk here" referring to the WhatsApp form of texting. This was immediately followed by a chart, listing prescription drugs offered for sale, such as Proviron, Dianabol, Anavar, Testosterone, Cialis, Viagra, and others. The list provided pricing in U.S. dollars. CARDARELLI ordered Proviron, Primobolin, Turnabolin, and T3 on this particular day. There are hundreds of communications with Wang, dating from March 2020 to March 2023, discussing the pricing, shipping and purchasing of prescription drugs, vials, labels and boxes.

12.     Also contained on the phone(s) are numerous communications with "customers" through "WhatsApp" and iOS iMessage concerning manufacturing, ordering, paying for, and delivering or picking up drugs. One particular WhatsApp thread between CARDARELLI and two others included a discussion on why the liquid Cialis was clumping. CARDARELLI responded with, "The new batch of clear bottles I made has not giving me any problem. No grain alcohol needed to make. But I make another batch this week and see why the problem may be." On another WhatsApp thread CARDARELLI and another person discussed drugs and pricing. In one message, CARDARELLI wrote a list of prescription drugs for sale including HGH (human growth hormone), Clenbuterol, and Cialis. In another thread that began in January 2022, and continued until March 2023, CARDARELLI and someone named (Andrew) discussed pricing, purchasing, and paying for several prescription drugs including HGH, cypionate, Deca, and Nan 300. CARDARELLI informed Andrew that he could come to his home in Derry to pick up or he would ship the drugs. I reviewed these and numerous other WhatsApp threads discussing the sale of prescription drugs, including steroids, by CARDARELLI and I found no evidence that CARDARELLI required his customers to provide a valid prescription from a licensed medical practitioner prior to selling the prescription drugs.

13.      The drugs observed at CARDARELLI'S residence, some of which are pictured above, are consistent with substances used illicitly for bodybuilding purposes or to counteract the side effects of substances used illicitly for bodybuilding purposes. Some of the drugs are labeled as containing steroids, which are Schedule III controlled substances. Further, these drugs, due to their methods of use and other factors, are prescription drugs because they are not safe for use except under the supervision of a licensed medical practitioner. Based on the evidence collected and described and depicted in the images above, CARDARELLI was maintaining a drug laboratory for the illegal manufacturing and distribution of large quantities of misbranded prescription drugs, including controlled substances, without a prescription, and for pecuniary ends.

14.      On May 8, 2023, a special agent from the Drug Enforcement Agency ("DEA") informed me CARDARELLI ordered and received a LFA Machines desktop tablet press. The press was delivered to ███████████████, an address not previously associated with CARDARELLI.

15.      On May 12, 2023, I received information from LFA Machines DFW, LLC, that CARDARELLI purchased a TDP 6s Desktop Tablet Press on, April 6, 2023. According to the manufacturer of this press, the press is capable of producing 2,500 tablets per hour. In addition to the pill press, CARDARELLI also purchased four kilograms of Firmapress in various colors and one kilogram of Magnesium Stearate. Firmapress is an all-in-one tableting mix or excipient used in the manufacturing of pills. Magnesium Stearate is an additive also used in the manufacturing of pills. The TDP 6s pill press as well as the Firmapress and Magnesium Stearate were all purchased after the execution of the search warrant.

16.      According to LexisNexis, Glenn Savastano and Jacquelyn McCleary were the current residents of ███████████████, when the LFA machine was ordered.

17.     On May 16, 2023, I spoke with Jacquelyn McCleary at her ███████████ ███████.

Upon arrival, I observed a package on the porch. The package was addressed to Glenn Savastano,

████████████████, and included the phone number ███████████, a number known to belong

to CARDARELLI. McCleary stated that she and her ex-husband Glen Savastano live at this

address. McCleary stated she didn't know CARDARELLI or anything to do with his suspected

drug manufacturing. She stated she had noticed several packages being delivered to her residence

but didn't know what they contained. After learning the investigation concerned drugs, McCleary

opened the package in front of myself and another FDA-OCI special agent. The package contained

unlabeled, empty pill bottles. McCleary then contacted Savastano via her phone and after speaking

with him, he agreed to meet for an interview.

18.     The same day, I interviewed Savastano, who stated he met CARDARELLI about a

year and a half prior at a gym called The Workout Club in Londonderry, NH. Savastano said in

April 2023, CARDARELLI asked if he could send a package to Savastano's residence, and

Savastano agreed. Savastano stated he never saw the first package, but other packages followed.

Savastano denied any knowledge of illegal items being shipped by CARDARELLI to his

(Savastano's) residence. CARDARELLI would pick some of them up from his porch and others

Savastano would leave in his vehicle while at The Workout Club, and CARDARELLI would take

them from there. Later this same day, Savastano was contacted by CARDARELLI concerning the

package. Savastano agreed to bring the package to The Workout Club on the following day and, as

before, to leave it in his unlocked vehicle from which CARDARELLI would retrieve it. Savastano

informed me of the plan, and I instructed Savastano to meet me near The Workout Club on May

17, 2023.

19.     On May 17, 2023, I met with Savastano, verified the package was the same package I observed the previous day and then watched Savastano park in the lot adjacent to the gym. Around 8:00 a.m. this same day, I observed CARDARELLI arrive, park adjacent to Savastano's vehicle, remove the package from the vehicle, and place it in his own.

20.     Later on this same day, Savastano informed me that CARDARELLI told him there would only be two more packages coming to Savastano's residence, one package containing something he (CARDARELLI) did not want Savastano's ex-wife opening.

21.     On May 19, 2023, Melissa Bivens, UPS security notified me that a package destined for 8 Ox Lane, Epsom, NH was at the UPS processing center in Manchester, NH. Bivens was aware of the investigation and the recent CBP seizures that took place in the same processing center. Bivens instructed UPS personnel to open and inspect the contents prior to delivering. The package contained two foil bags containing white in color powder labeled only "TRA 100g" and "TRE 200g" and a third foil bag contained a bottle with an unknown liquid labeled "BU 1kg." The foil packaging, the look of the powder, and Chinese origin lead me to believe, based on my training and experience in similar investigations, that powders and liquid are drugs associated with the unlawful manufacturing of steroids.

22.     On this same day, UPS agreed to deliver the package at an assigned time, allowing myself and another FDA-OCI SA to observe. Prior to the package delivery, I contacted McCleary and Savastano, who agreed that upon receipt of the package, they would open and give the package and its contents to me to be collected as evidence. Just before 1:00 p.m. on May 19, 2023, I observed a UPS driver deliver the package. I then contacted McCleary who opened the package and asked me to take it. The package was collected as evidence. After collecting the package, I and another FDA-OCI SA maintained surveillance of the residence. Around 2:00 p.m. CARDARELLI pulled

into the driveway of ████████████████ . I observed him walk up to the porch, look around and then walk back to his vehicle. Prior to CARDARELLI getting into his vehicle, I approached, identified myself and the other FDA-OCI SA, and, after informing him that he was not being detained or arrested, asked him why he was there. CARDARELLI stated he was there to see a friend; I asked him who and he responded "Glen." I asked him why he didn't knock on the door; he didn't respond. I then asked if he was there to pick up a package to which he said yes but refused to answer any other questions. I provided CARDARELLI a business card and CARDARELLI departed the area.

23.     Since the execution of the search warrant, two additional packages containing labeling and vial boxes have been seized by CBP and collected as evidence. One other box suspected to contain labeling and vial boxes was delivered to CARDARELLI, prior to CBP being alerted of its existence. Further, McCleary notified me of another package delivered to her residence containing unlabeled/empty bottles. McCleary voluntarily released this package to me, and the package was collected as evidence.

## RELEVANT FDA AUTHORITY

24.     The FDA is responsible for regulating the manufacture, labeling, and distribution of all drugs, including prescription drugs, shipped or received in interstate commerce.  The FDA is also responsible for enforcing the provisions of the FDCA as it pertains to drugs.

25.     The FDCA defines "drug" to include articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans; articles (other than food) intended to affect the structure or function of the body of humans; and articles intended for use as a component of any such articles.  21 U.S.C. § 321(g)(1).

26.     The FDCA defines a "prescription drug" as: any drug which, because of its toxicity and other potential for harmful effects, or the method of its use, or the collateral measures necessary to its use, is not considered safe for use except under the supervision of a practitioner licensed by law to administer such drugs; or any FDA-approved drug which is limited by its approval to use under the professional supervision of a practitioner licensed by law to administer prescription drugs. 21 U.S.C. § 353(b)(1).

27.     Among other prohibited acts, the FDCA prohibits the doing of an act with respect to a drug, after the shipment of the drug in interstate commerce, that results in the drug being misbranded while held for sale.  21 U.S.C. § 331(k).

28.     Under the FDCA, a drug is misbranded while held for sale if, among other things, it is a prescription drug and it was dispensed without a valid prescription from a licensed medical practitioner.  21 U.S.C. § 353(b)(1).

## <u>CONCLUSION</u>

29.     Based on the information in this Affidavit, probable cause exists to believe that RALPH CARDARELLI has committed and is committing criminal violations namely 21 U.S.C. § 841(a)(1) (distribution or possession with intent to distribute controlled substances) and 21 U.S.C. §§ 331(k) (causing a drug to become misbranded after shipment in interstate commerce). Accordingly, I request that this Honorable Court issue a Complaint and Arrest Warrant for RALPH CARDARELLI.

Respectfully submitted,

/s/ William Hughes
William Hughes, Special Agent
Office of Criminal Investigations
Food and Drug Administration

The affiant appeared before me by telephonic conference, on this date, pursuant to Fed. R. Crim. P. 4.1, and affirmed under oath the content of this affidavit and application.


Date: ___Jul 17, 2023_____

Time: _2:37 PM_____

___/s/ Andrea K. Johnstone_____
Honorable Andrea K. Johnstone
United States Magistrate Judge

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES AT 4 JOSEPH STREET, DERRY, NEW HAMPSHIRE, THE PERSON OF RALPH CARDARELLI, AND ELECTRONIC DEVICES | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Jarred Matyka, being first duly sworn, hereby depose and state as follows:

1.      I am a federal law enforcement officer employed by the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.  I am the case agent with primary responsibility over the investigation herein described.  I have direct and indirect knowledge of the following facts.

## INTRODUCTION AND AGENT BACKGROUND

2.      This Affidavit is submitted in support of an application for an anticipatory search warrant, under Rule 41 of the Federal Rules of Criminal Procedure, conditionally authorizing law enforcement agents to search for and seize property at certain locations—upon the expected occurrence of the events detailed in the Purpose of Affidavit section of this Affidavit.

3.      I am a Special Agent with Homeland Security Investigations ("HSI").  I have worked in that capacity since March 2006.  My regular duties as a Special Agent with HSI include the investigation of a broad range of federal criminal law violations involving immigration and customs.  I have also been cross-designated to investigate federal criminal law violations involving narcotics distribution.  I am currently assigned to the Manchester, New Hampshire field office, where I have worked for the past four years.

4.      As a Special Agent with HSI, I am authorized to apply for the issuance of the requested warrant.  HSI is the principal investigative arm of the U.S. Department of Homeland Security with broad legal authority to conduct federal criminal investigations into the illegal cross-border movement of people, goods, money, technology, and other contraband throughout the United States.  I am further aware, pursuant to this authority, HSI special agents are empowered to perform federal law enforcement functions, including the execution and service of search warrants issued under the authority of the United States, which encompass the investigation of federal criminal law violations.  As further described in this Affidavit, I am engaged in the enforcement of federal criminal law, and, thus, I am a federal law enforcement officer within the meaning of Fed. R. Crim. P. 41(a)(2)(C), authorized to apply for the requested search warrant.

5.      I have received considerable relevant training during my law enforcement career. I have attended training courses offered by various other federal, state, and local law enforcement agencies, as well as private companies such as the regional information sharing system (RISS) and Thermo-Scientific TruNarc training.   I have been trained in drug investigations, narcotic identification, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures.

6.      My drug enforcement experience is varied.  I have participated in the execution of search warrants resulting in the seizure of controlled substances and paraphernalia used in the manufacturing and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the debriefing of subjects, witnesses, and informants who had personal

knowledge regarding large-scale narcotics trafficking operations. I have participated in major aspects of drug investigations, including electronic and physical surveillance, controlled purchases of narcotics, search warrant executions, and arrests.

7.     Through my training, education, and experience, I have gained a nuanced understanding of criminal drug distribution activity. I have become generally familiar with the way that drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement. I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations, including methods used by them to distribute, store, and transport narcotics, as well as methods used by them to collect, expend, account for, transport, and launder drug proceeds. I am also familiar with the way that narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. I have also learned that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

8.     I have consulted various sources of information to support my statements in this Affidavit. These statements are based on my participation in this investigation, as well as information I consider reliable from the following sources: my experience investigating drug trafficking offenses; oral and written reports and documents about this investigation that I have

received from members of other federal and local law enforcement agencies; discussions I have had personally concerning this investigation with other experienced narcotics investigators; physical surveillance conducted by law enforcement agents assisting this investigation, the results of which have been reported to me either directly or indirectly; and public records and law enforcement databases, among other sources.

9.    This Affidavit distinguishes between my direct and indirect knowledge of the matters asserted.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement agents, and I specifically relied on oral reports and opinions from other law enforcement agents. When information is based on my personal knowledge or conclusion, it will be so stated.

10.   This Affidavit is not an exhaustive or comprehensive account of information gathered during the investigation. As this Affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of the requested warrant, I have not included every detail of every aspect of the investigation that is known to me.  That said, this Affidavit does contain all the material information known to me that is pertinent to the requested search warrant, but it does not set forth all my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

11.   This Affidavit is made in support of an application for an anticipatory search warrant, conditionally authorizing the search of the following locations:

a.    The entire premises located at **4 JOSEPH STREET, DERRY, NEW HAMPSHIRE** (the "SUBJECT PREMISES"), particularly described in **ATTACHMENT A-1**;

b.      The person of **RALPH CARDARELLI** ("CARDARELLI"), identified in **ATTACHMENT A-2**; and

c.      The **electronic devices**, including mobile phones, computers, and tablets, belonging to and/or primarily used by CARDARELLI, via forensic search and examination of content created and/or stored, from March 1, 2022 through the present, as described in **ATTACHMENT B**.

12.     The contemplated search or execution of the requested anticipatory warrant is conditioned on the expected occurrence of the following events:

a.      The controlled delivery of the package bearing DHL tracking #3629777874 with recipient name RALPH CARDARELLI, and containing three pieces of a pill dress die set marked "AD" and "30" (the "SUBJECT PACKAGE"), to the SUBJECT PREMISES;

b.      The subsequent possession of the SUBJECT PACKAGE by any person, other than law enforcement assisting this investigation, at the SUBJECT PREMISES; and

c.      The taking of the SUBJECT PACKAGE into any of the building structures within the SUBJECT PREMISES.

13.     To the extent that the expected occurrence of the triggering events may occur at any time during the day or night, I also request authorization to execute the requested warrant during the daytime or in the nighttime.

14.     Based on my training and experience, I submit that the facts contained in this Affidavit establish probable cause to believe that CARDARELLI, and others yet unknown to the government, have committed violations of 21 U.S.C. § 843(a)(5) (unlawful possession of die to reproduce mark on drug), 21 U.S.C. § 863(a)(3) (importation or exportation of drug paraphernalia),

21 U.S.C. § 846 (conspiracy to import or export drug paraphernalia), and 18 U.S.C. § 545 (smuggling goods into the United States), and that evidence, fruits, and instrumentalities of these violations, as well as evidence of the identity of co-conspirators, will be found in the SUBJECT PREMISES, on CARDARELLI, and within his electronic devices—upon the expected occurrence of events herein specified.

## LOCATIONS TO BE SEARCHED

15.     I refer the Court to **ATTACHMENT A-1** and **ATTACHMENT A-2** incorporated herein by reference.

## ITEMS TO BE SEIZED

16.     I refer the Court to **ATTACHMENT B** incorporated herein by reference.

## PROBABLE CAUSE

17.     On or about March 10, 2023, members of the Customs and Border Protection ("CBP"), Anti-Terrorism Contraband Enforcement ("A-TCET"), detained a white and yellow package during a border search at Logan International Airport in Boston, Massachusetts.  They were conducting Customs inspections of international cargo arriving at the port of Boston, when CBP Officer Chris Corey seized a shipment that produced a package with a "DHL EXPRESS WORLDWIDE" label affixed to it.  The package entered the United States from Hong Kong and manifested as "STEEL MOLD USE EVERETT SAMPLE," and the label showed DHL Tracking #3629777874 with recipient "RALPH CARDARELLI 4 JOSEPH STREET DERRY NH 03038" (collectively the "SUBJECT PACKAGE").  The image below depicts the DHL package and label described.

**SUBJECT PACKAGE**



18.     The SUBJECT PACKAGE was subsequently inspected.  During the inspection, officers discovered three (3) pieces of a pill press die set marked "AD" and "30."  Based on my training and experience, I know that pill press dies with the markings "AD" and "30" are used to make counterfeit 30-milligram Adderall pills, which are typically made using methamphetamine and other ingredients.  As such, I determined the pill press dies to be prohibited drug paraphernalia subject to seizure, under 21 U.S.C. § 863(a)(3) and 19 U.S.C. § 1595a(c)(2)(A), because their features contained, "the trademark, trade name, or other identifying marks, imprints or device of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render such drug a counterfeit substance," a violation of 21 U.S.C. § 843(a)(5).  Accordingly, the SUBJECT PACKAGE was then transferred from CBP seized property in Boston to HSI's in Manchester, New Hampshire District Office, where it is currently located.  The image below depicts the pill press die set described.

**PILL PRESS DIE SET**



19.     Law enforcement agents proceeded to query the name and address shown on the shipping label and made significant findings.   Through the Town of Derry, New Hampshire, Assessors Database, investigators positively identified CARDARELLI as the owner of the SUBJECT PREMISES.   According to these records, CARDARELLI purchased the SUBJECT PREMISES, on or about February 24, 2022, with JESSICA DASILVA as co-owner.   Investigators also learned that, not long after the purchase, CARDARELLI began receiving packages from China and/or Hong Kong.   Our investigation revealed that, since March 1, 2022, CARDARELLI has received approximately 46 packages from China and/or Hong Kong shipped to CARDARELLI and the SUBJECT PREMISES.

20.     Further, a criminal history check for CARDARELLI showed arrest and conviction entries on his criminal record.   CARDARELLI's Massachusetts criminal history shows a felony cocaine trafficking arrest or arraignment, entered on March 7, 2003.   CARDARELLI'S New Hampshire criminal history shows a misdemeanor conviction for possession of a controlled substance, entered on November 16, 2011.

21.     During my investigation into the SUBJECT PACKAGE, I became aware of a separate ongoing investigation by the U.S. Postal Inspection Service ("USPIS") and the Food and Drug Administration ("FDA") also focusing on CARDARELLI's activities.   As part of this separate investigation, on March 1, 2023, CBP Officer Adam Belmarsh reported that a package addressed to CARDARELLI was detained and inspected.   The package contained small boxes and labels, and the labels stated "SummitGrow Labs," **www.summitgrow-pharma.com**, and carried the drug names, Anavarbol, Tren A200 and Npp 100 (Nandrolone Phenylproplonate).   CBP Officer Belmarsh provided photographs of the labels.   The package originated in Xiamen, FJ, China.

Following documenting the contents of the package, it was allowed to pass through customs. According to FedEx tracking, the package was delivered to CARDARELLI, on March 2, 2023.

22.     Based on my knowledge and experience, international shipping arrangements almost necessarily involve the use of electronic devices.  Pill presses and parts thereof—including stamped pill dies, counterfeit drugs and other ingredients—commonly used to illegally manufacture counterfeit drugs, are typically purchased through online vendors in other countries, for which electronic devices are generally needed to accurately place, confirm, and track purchase orders. Thus, I believe that CARDARELLI, or someone on his behalf, likely used electronic devices, including a smartphone, computer, and/or tablet, to ensure the successful purchase and delivery of the pill press die set that is currently in the possession of HSI.

23.     If the requested anticipatory search warrant is issued, HSI, in conjunction with other federal and state law enforcement agencies, intends to deliver the SUBJECT PACKAGE to the SUBJECT PREMISES.  At the time of the delivery by law enforcement, the SUBJECT PACKAGE will contain the contents of the original package seized by CBP, including one die with the marking "AD" and one die with the marking "30."  Investigators expect that someone at the SUBJECT PREMISES will accept and take possession of the SUBJECT PACKAGE, and finally take the same into any of the buildings within the SUBJECT PREMISES.  Although investigators expect the triggering events to occur, the time at which they will occur is not certain.  The conditions precedent to executing the requested warrant might not occur until nighttime.  For example, the SUBJECT PACKAGE might not be taken into the residence until nighttime.  In such instance, evidence may be moved or destroyed.  Accordingly, I also request authorization to execute this warrant in either the daytime or the nighttime.

## USE OF PREMISES, ELECTRONICS IN DRUG TRAFFICKING

24.     Based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I am aware of certain relevant characteristics associated with drug trafficking.

25.     I know that drug traffickers often store drugs and items necessary for the manufacture of drugs in private places including in their residences, areas of curtilage, outbuildings such as sheds or trailers, vehicles, and in stash houses.

26.     I know that drug traffickers often possess and store firearms in their residences, their vehicles, and in stash houses to protect themselves, their supplies of drugs, and/or drug proceeds.

27.     I know that drug traffickers must maintain, on-hand, large amounts of U.S. Currency to financially sustain their on-going narcotics business.

28.     I know that individuals involved in narcotics trafficking often maintain records linking them to their trafficking activity and their drug trafficking associates.  These records may be stored physically or digitally on computers or other electronic devices or media.  These records may include notes, records or ledgers of narcotics sales, debts owed, past or future shipments, and other records, including telephone records, which identify customers and/or other co-conspirators. Through my training and experience, I know that such records may be in code and/or may appear as rather innocuous and not particularly incriminating on their face.  Such records are often maintained by drug traffickers for extended periods of time.  The aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them including on electronic devices and/or stored in their residences and their vehicles.

29.     I know that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, their vehicles, stash houses, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities.

30.     I know that drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies.  Even though these assets are in the names of others, the drug traffickers actually own and use these assets, and exercise dominion and control over them.

31.     I know that it is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals and gemstones, electronics, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashiers' checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the drug traffickers within their residences, businesses, vehicles or other locations which they maintain dominion and control over.

32.     I know that when drug traffickers amass significant proceeds from the sale of drugs, they often attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency. Drug traffickers often commingle narcotics proceeds with money generated by legitimate businesses.

33.     I know that drug traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.

34.     I know that drug traffickers take or cause to be taken photographs of themselves, their associates, and their property. I know that these traffickers usually maintain these photographs in their possession.  I am also aware that drug traffickers store on electronic devices photos, videos, and other media associated with the sale, purchase, and distribution of illegal drugs.  This media includes photographs and videos of the drugs and other items associated with their illegal activities to demonstrate their prowess and as an advertisement of their wares.  These photos, videos, and other media often establish the identities of the individuals involved in the sale, purchase, and distribution of the illegal drugs.

35.     I know that drug traffickers often use or otherwise store data about importation, transportation, ordering, purchasing, shipping, and distribution of controlled substances on electronic devices.  These communications and other records also tend to establish the traffickers' identities.  Based on my training and experience, I am aware that drug traffickers often use electronic devices to facilitate the purchase of illegal drugs.  These electronic devices often contain financial data relating to the transactions, such as bank account numbers, bank records, credit card numbers, credit card account and account information used for the purchase of illegal drugs, and all identifying information for the same.  The communications and other data often also demonstrate the drug trafficker's state of mind.

36.     I know that drug traffickers also use electronic devices for communication or other forms of data storage or sending/receiving relating to bank records, account information, and other electronic financial records ties to the importation, transportation, ordering, purchasing, and distribution of controlled substances.

37.     I know that communication through electronic devices—such as through telephone calls, texts, chat, email, instant messaging, and other applications—enables drug distributors to maintain constant contact with associates, drug suppliers, and customers.  I know that it is common for drug traffickers to use these applications to communicate with associates relating to the logistics of their drug trafficking business and store information (purposely or inadvertently) relating to their unlawful activities.

38.      I know that drug traffickers often use cellular and/or portable telephones, smart phones, and other electronic equipment and data storage devices in furtherance of their criminal activities and to maintain contact with associates, drug suppliers and customers.

39.     I know that drug traffickers who buy and/or sell controlled substances on online marketplaces often rely on one or more means of electronic communication (such as encrypted email and chat communications) as a means to facilitate this expedient communication.

40.     I know that drug traffickers who often buy and/or sell controlled substances on online marketplaces often use or take payments in the form of cryptocurrency, money orders or other forms of payments.

41.     I know that drug traffickers often utilize multiple vehicles in furtherance of their drug trafficking to include rental vehicles and vehicles registered in the names of third parties.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

42.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some time on the device.  This information can sometimes be recovered with forensics tools.

43.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

44.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

45.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46.     As described in **ATTACHMENT B**, I am seeking authorization to locate not only electronically stored information that might serve as direct evidence of the crimes described on the

warrant, but also forensic evidence that establishes how the devices were used, the purpose of their use, who used them, and when.

47.     Based on the facts contained in this Affidavit, and the reasonable inferences drawn from them, I submit there is probable cause to believe that this forensic electronic evidence is likely be found on the devices for the following reasons.

> a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

> b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

> c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

48.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection to determine whether it is evidence described by the warrant.

## CONCLUSION

49.     Based on my training and experience, I submit that the facts contained in this Affidavit establish probable cause to believe that CARDARELLI, and others yet unknown to the government, have committed violations of 21 U.S.C. § 843(a)(5) (unlawful possession of die to reproduce mark on drug), 21 U.S.C. § 863(a)(3) (importation or exportation of drug paraphernalia), 21 U.S.C. § 846 (conspiracy to import or export drug paraphernalia), and 18 U.S.C. § 545 (smuggling goods into the United States), and that evidence, fruits, and instrumentalities of these violations, as well as evidence of the identity of co-conspirators, will be found in the SUBJECT

PREMISES, on CARDARELLI, and within his electronic devices—upon the expected occurrence of events herein specified.  Therefore, I request that the Court issue the requested anticipatory warrant, to be executed upon the occurrence of certain triggering events, at any time during the daytime or nighttime, authorizing the search of the locations herein described, for items herein specified.

Signed under the pains and penalties of perjury this __21st__ day of _____March_____ 2023.

/s/ Jarred Matyka
Jarred Matyka
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations

The affiant appeared before me by telephonic conference, on this date, pursuant to Fed. R. Crim. P. 4.1, and affirmed under oath the content of this affidavit and application.

Date:  3 / 2 1 / 2 0 2 3

Time:  3 : 3 5  p . m .

United States Magistrate Judge

**Attachment B to Complaint Affidavit**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES AT 4 JOSEPH STREET, DERRY, NEW HAMPSHIRE | Case No. ___23-mj-55-01-DL___ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jarred Matyka, being first duly sworn, hereby depose and state as follows:

1.      I am a federal law enforcement officer employed by the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.  I am the case agent with primary responsibility over the investigation herein described.  I have direct and indirect knowledge of the following facts.

**INTRODUCTION AND AGENT BACKGROUND**

2.      This Affidavit is submitted in support of an application for a search warrant, under Rule 41 of the Federal Rules of Criminal Procedure, authorizing law enforcement agents to search for and seize property items at 4 JOSEPH STREET, DERRY, NEW HAMPSHIRE.

3.      I am a Special Agent with Homeland Security Investigations ("HSI").  I have worked in that capacity since March 2006.  My regular duties as a Special Agent with HSI include the investigation of a broad range of federal criminal law violations involving immigration and customs.  I have also been cross-designated to investigate federal criminal law violations involving narcotics distribution.  I am currently assigned to the Manchester, New Hampshire field office, where I have worked for the past four years.

4.      As a Special Agent with HSI, I am authorized to apply for the issuance of the requested warrant.  HSI is the principal investigative arm of the U.S. Department of Homeland

Security with broad legal authority to conduct federal criminal investigations into the illegal cross-border movement of people, goods, money, technology, and other contraband throughout the United States.  I am further aware, pursuant to this authority, HSI special agents are empowered to perform federal law enforcement functions, including the execution and service of search warrants issued under the authority of the United States, which encompass the investigation of federal criminal law violations.  As further described in this Affidavit, I am engaged in the enforcement of federal criminal law, and, thus, I am a federal law enforcement officer within the meaning of Fed. R. Crim. P. 41(a)(2)(C), authorized to apply for the requested search warrant.

5.      I have received considerable relevant training during my law enforcement career. I have attended training courses offered by various other federal, state, and local law enforcement agencies, as well as private companies such as the regional information sharing system (RISS) and Thermo-Scientific TruNarc training.   I have been trained in drug investigations, narcotic identification, search warrants, undercover techniques, surveillance, debriefing of informants, and other investigative procedures.

6.      My drug enforcement experience is varied.  I have participated in the execution of search warrants resulting in the seizure of controlled substances and paraphernalia used in the manufacturing and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds.  I have participated in the debriefing of subjects, witnesses, and informants who had personal knowledge regarding large-scale narcotics trafficking operations.  I have participated in major

aspects of drug investigations, including electronic and physical surveillance, controlled purchases of narcotics, search warrant executions, and arrests.

7.      Through my training, education, and experience, I have gained a nuanced understanding of criminal drug distribution activity.  I have become generally familiar with the way that drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am familiar with the various methods of operation employed by narcotics traffickers to further their illicit operations, including methods used by them to distribute, store, and transport narcotics, as well as methods used by them to collect, expend, account for, transport, and launder drug proceeds.  I am also familiar with the way that narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions. I have also learned that narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs, to distributors and co-conspirators at multiple levels, and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.

8.      I have consulted various sources of information to support my statements in this Affidavit.  These statements are based on my participation in this investigation, as well as information I consider reliable from the following sources: my experience investigating drug trafficking offenses; oral and written reports and documents about this investigation that I have received from members of other federal and local law enforcement agencies; discussions I have had

personally concerning this investigation with other experienced narcotics investigators; physical surveillance conducted by law enforcement agents assisting this investigation, the results of which have been reported to me either directly or indirectly; and public records and law enforcement databases, among other sources.

9.      This Affidavit distinguishes between my direct and indirect knowledge of the matters asserted.  Unless otherwise indicated, the statements contained herein are summaries of information that I have received from other law enforcement agents, and I specifically relied on oral reports and opinions from other law enforcement agents. When information is based on my personal knowledge or conclusion, it will be so stated.

10.     This Affidavit is not an exhaustive or comprehensive account of information gathered during the investigation. As this Affidavit is being submitted for the limited purpose of establishing probable cause to support the issuance of the requested warrant, I have not included every detail of every aspect of the investigation that is known to me.  That said, this Affidavit does contain all the material information known to me that is pertinent to the requested search warrant, but it does not set forth all my knowledge about this matter.

## **PURPOSE OF AFFIDAVIT**

11.     This Affidavit is made in support of an application for a search warrant, authorizing the search of:

a.      The entire premises located at **4 JOSEPH STREET, DERRY, NEW HAMPSHIRE** (the "SUBJECT PREMISES"), particularly described in **ATTACHMENT A**.

12.     Based on my training and experience, as well as my conversations with trained and experienced investigators who specialize in detecting and identifying misbranded or unapproved

drugs, I submit that the facts contained in this Affidavit establish probable cause to believe that RALPH CARDARELLI has committed violations of 21 U.S.C. § 841(a)(1) (distribution or possession with intent to distribute controlled substances) and 21 U.S.C. §§ 331(a) and 331(d) (introduction into interstate commerce of misbranded and unapproved drugs), and that evidence, fruits, and instrumentalities of these violations will be found in the SUBJECT PREMISES.

### LOCATIONS TO BE SEARCHED

13.     I refer the Court to **ATTACHMENT A** incorporated herein by reference.

### PROPERTY TO BE SEIZED

14.     I refer the Court to **ATTACHMENT B** incorporated herein by reference.

### PROBABLE CAUSE

15.     I am currently involved in an investigation concerning violations of 21 U.S.C. § 843(a)(5) (unlawful possession of die to reproduce mark on drug), 21 U.S.C. § 863(a)(3) (importation of drug paraphernalia), 21 U.S.C. § 846 (conspiracy to import or export drug paraphernalia), and 18 U.S.C. § 545 (smuggling goods into the United States).  This investigation arose from the March 10, 2023 Customs and Border Protection ("CBP") seizure of a package with a "DHL EXPRESS WORLDWIDE" label affixed to it.  The package entered the United States from Hong Kong and manifested as "STEEL MOLD USE EVERETT SAMPLE," and the label showed DHL Tracking #3629777874 with recipient "RALPH CARDARELLI 4 JOSEPH STREET DERRY NH 03038" (collectively the "SUBJECT PACKAGE").

16.     In connection with this investigation, on March 21, 2023, I obtained federal search warrant #23-mj-54-01-DL.  This anticipatory search warrant conditionally authorized the search of the SUBJECT PREMISES—upon the expected occurrence of certain specified events—which included the controlled delivery of the SUBJECT PACKAGE to the SUBJECT PREMISES.

Attached hereto as **ATTACHMENT C** is a true and accurate copy of my supporting affidavit, which details relevant information obtained during the investigation.  My supporting affidavit is further incorporated herein by reference for all intents and purposes.

17.     On March 23, 2023, in the morning hours, law enforcement agents assisting in this investigation briefed regarding the parameters and planned execution of the anticipatory search warrant.  Soon after, law enforcement agents proceeded to the TARGET PREMISES and ultimately executed the warrant, upon the occurrence of certain specified triggering events.   After law enforcement agents entered the detached three-car garage within the SUBJECT PREMISES, under the warrant, the following items were observed: (1) a "mixer" used to mix raw materials for pill manufacturing, which is depicted in the first image below; (2) scales used to weigh raw materials, which is depicted in the second image below; (3) shelves containing various finished products and separated by product type, which are depicted in the third image below; (4) bins containing various finished products, all separated by product type, which are depicted in the fourth image below; and (5) a "pill press" utilized to manufacture pills, which is depicted in the fifth image below.











18.     Based on our collective training and experience, law enforcement agents present at the scene believe that the pill die, which was the subject of the anticipatory warrant, would be utilized in the "pill press" machine depicted in the fifth image.  We also believe that the raw ingredients that were mixed probably used the "mixer" machine depicted in the first image, and would also be placed into the "pill press" machine to create pills.

19.     Special Agents with the Food and Drug Administration Office of Criminal Investigations ("FDA-OCI") were also assisting in the investigation and were present for the search warrant execution, including Derek Roy, Brian Hendricks, and Nam Cho.  I am informed Derek Roy and Brian Hendricks have been adequately trained, and have experience, in the detection and identification of drugs and counterfeit drugs, which fall within the enforcement and investigative authority of the FDA.  I have consulted with them regarding the items observed and the significance of those observations.  I am informed, based on their collective training and experience, the items described and depicted in the images above, are consistent with maintaining a drug laboratory for the illegal manufacturing and distribution of large quantities of unapproved, counterfeit, and misbranded drugs without a prescription, for pecuniary ends.

20.     Specifically, I am informed that the drugs observed at the SUBJECT PREMISES, some of which are pictured above, are consistent with substances used illicitly for bodybuilding purposes or to counteract the side effects of substances used illicitly for bodybuilding purposes. Further, I am informed these drugs are not approved by the FDA for such uses and lack labeling with adequate direction for use, and that these drugs, due to their methods of use and other factors, are prescription drugs that are not safe for use except under the supervision of a licensed medical practitioner.

21.     During the search of the SUBJECT PREMISES, I observed what appear to be customer lists of individuals located outside of the state of New Hampshire.   Nothing on the customer lists or other evidence observed during the search of the SUBJECT PREMISES indicates that a prescription from a licensed medical practitioner is required to purchase these drugs.   Further, I am informed by the FDA-OCI Special Agents based on their training and experience that distributors of unapproved drugs for bodybuilding purposes typically do not require a prescription from their customers.

22.     FDA-OCI identified "SummitGrow Labs", www.summitgrow-pharma.com, listed on the packaging of the products depicted above.  An FDA OCI Special Agent attempted to navigate to the www.summitgrow-pharma.com website. The below error message appeared: HTTP Error 401.3 – Unauthorized, You do not have permission to view this directory or page because of the access control list (ACL) configuration or encryption settings for this resource on the web server. An FDA-OCI SA working within OCI's Cyber Crime Investigations Unit also attempted to gain access to the website. The FDA-OCI SA was unable to open the website as it appeared to be IP sensitive. FDA-OCI visited the website archive.org wherein summitgrow-pharm.com could be viewed as it appeared in June 2021, Summitgrow Pharma co.,Ltd (archive.org).  A review of the archived website revealed the company was Summitgrow Co., LTD. Under the "Welcome" block the following was written:

> "Welcome to Summitgrow Pharma, where our utmost commitment is improving the quality of life for each and every individual. It is through this commitment that we constantly strive to innovate, improve and increase the availability of cost-efficient generic medicines to the global market.

Our backgrounds were in bodybuilding yes, but educationally were science based which helped us understand the requirements of the human body. This is one of the reasons you do not see Max Force releasing gimmick products which are popular one month but are scorned the following, if there is no science to support something we do not produce it. As a company we help and advise many athletes in many fields and sponsor many bodybuilding, strongman and powerlifting events."

23.    Also on the homepage the following drugs were listed for sale: Viagra, Turninabolin, Tamoxifei, T3, Stanobol, Provironic, Primobol, Clenbuterol, Cialis and Dianabol. All of these products are known to be used extensively in the body building community. The web page tabs included "Injections", "Tablets", "HGH/Peptides", "Anti-Counterfeit", and a contact us tab. Under the injections, tablets and HGH/peptides tabs, there were additional drugs available for sale. Under the anti-counterfeit tab a box labeled "Please enter the security code" existed. Under the contact us tab a form requesting name, and other contact information was present to send a question to the company. No other company info was present.

24.    While on scene at the SUBJECT PREMISES, FDA OCI SAs identified similarly labeled products as those identified on the www.summitgrow-pharma.com, such as Viagra and Turninabolin, among others.

25.    Given the nature of the items observed, law enforcement agents ceased and discontinued their search, because it was understood that the anticipatory warrant authorized the search for non-drug items.  Thus, as of the date and time of signing this Affidavit, law enforcement agents have the SUBJECT PREMISES secured, awaiting the issuance of the requested warrant, expressly authorizing a broader search for controlled substances.  While investigators were awaiting amendments to the original anticipatory search warrant, a United Parcel Service ("UPS")

truck arrived at the residence.  The driver of the UPS truck told investigators that he had a package delivery for 4 Joseph St.  At that time the driver was told he could deliver the packages as normal. The driver left both packages outside of the garage door. Both packages are addressed to Ralph CARDARELLI at 4 Joseph St Derry, NH.  One package, a small Manila padded envelope is shipped from GOODLAND DISTRIBUTION, 6060 N. 77th Street, Milwaukee, WI 53218.  The other package, a 20x16x6 box is shipped from RESEARCH LABORATORY SUPPLY (D.B.A MED LAB SUPPLY), Pompano Beach, Fl.  Authorization is further requested to search both boxes for items described in **ATTACHMENT B**, as they constitute containers belonging to CARDARELLI within the SUBJECT PREMISES that may contain items subject to seizure under the requested warrant.  The two images below depict the boxes herein described.





## RELEVANT FDA REGULATORY AUTHORITY

26.     In consultation with the aforementioned members of the FDA present during the search warrant execution, as well as counsel for the FDA, I have been advised of the following.

27.     The FDA is responsible for regulating the manufacture, labeling, and distribution of all drugs, including prescription drugs, shipped or received in interstate commerce. The FDA is also responsible for enforcing the provisions of the FDCA as it pertains to drugs.

28.     The FDCA defines "drug" to include articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in humans; articles (other than food) intended to affect the structure or function of the body of humans; and articles intended for use as a component of any such articles.  21 U.S.C. § 321(g).

29.     The FDCA defines a "prescription drug" as: any drug which, because of its toxicity and other potential for harmful effects, or the method of its use, or the collateral measures necessary to its use, is not considered safe for use except under the supervision of a practitioner licensed by law to administer such drugs; or any FDA-approved drug which is limited by its approval to use under the professional supervision of a practitioner licensed by law to administer prescription drugs. 21 U.S.C. § 353(b)(1).

30.     The FDCA defines a "new drug" as any drug that is "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 321(p)(1).

31.     The FDA is responsible for reviewing New Drug Applications ("NDAs") to determine whether a new drug is safe and effective for its intended uses; a new drug cannot be lawfully marketed in the United States unless and until the FDA approves an NDA for that drug. 21 U.S.C. § 355(a).

32.     Among other disclosures, every NDA is required to contain information regarding the intended uses of the drug; specifications, components, processes and controls used during manufacture of the drug itself; specifications related to containers and closure systems, packaging materials and methods; and the product labeling, including exterior labeling and package inserts. 21 U.S.C. §§ 355(b)(1); 21 C.F.R. § 314.50.  FDA's determination about the safety and efficacy of

a drug, which is the basis for approval, is based on the product being manufactured at a specified facility, in a specific strength and dosage form, and packaged, held, and labeled in a specific manner.  Thus, an "approved" new drug is not merely the pill, tablet, or liquid that is produced at an FDA-registered manufacturing facility.  Rather, all aspects of a drug are required to match the description of the drug in the FDA-approved NDA.  If a drug differs from the description in the FDA-approved NDA, it is not the approved drug, and the safety and efficacy of that drug is unknown.

33.   Under the FDCA, a drug is misbranded if, among other things, it is a prescription drug and it was dispensed without a valid prescription from a licensed medical practitioner.  21 U.S.C. § 353(b)(1).

34.   A drug is also misbranded if its labeling fails to bear adequate directions for use. 21 U.S.C. § 352(f)(1).  "Adequate directions for use" means that the directions are sufficient for a layperson to safely use the drug for the purposes for which it is intended.  21 C.F.R. § 201.5. Directions under which a layperson can use a drug safely cannot be written for prescription drugs because such drugs can, by definition, only be used safely at the direction, and under the supervision, of a licensed practitioner.  FDA-approved prescription drugs with their approved labeling are exempt from having adequate directions for use by a layperson under specific circumstances.  21 C.F.R. § 201.100.  But unapproved prescription drugs do not meet all the conditions for an exemption from the requirement of having adequate directions for use and are by law per se misbranded.

35.   Among other prohibited acts, the FDCA prohibits the introduction or delivery for introduction of misbranded or unapproved new drugs into interstate commerce.  21 U.S.C. § 331(a) and (d).

## CONCLUSION

36.    Based on my training and experience, as well as my conversations with trained and experienced investigators who specialize in detecting and identifying misbranded or unapproved drugs, I submit that the facts contained in this Affidavit establish probable cause to believe that CARDARELLI has committed violations of 21 U.S.C. § 841(a)(1) (distribution or possession with intent to distribute controlled substances) and 21 U.S.C. §§ 331(a) and 331(d) (introduction into interstate commerce of misbranded and unapproved drugs), and that evidence, fruits, and instrumentalities of these violations will be found in the SUBJECT PREMISES, on CARDARELLI.  Therefore, I request that the Court issue the requested warrant, authorizing the search of the location herein described, for items herein specified.

Signed under the pains and penalties of perjury this ___23rd___ day of _____March_____ 2023.


_/s/ Jarred Matyka_____
Jarred Matyka
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations


The affiant appeared before me by telephonic conference, on this date, pursuant to Fed. R. Crim. P. 4.1, and affirmed under oath the content of this affidavit and application.


Date:   __3/23/2023_____       _____
                                    United States Magistrate Judge
Time:   __4:20 p.m._____